# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PETER BRINCKERHOFF, INDIVIDUALLY AND AS TRUSTEE OF THE PETER R. BRINCKERHOFF REV. TR U A DTD 10/17/97, and on behalf of all others similarly situated, | : : : : : : | |
| Plaintiff, | : : | |
| v. | : : | **C.A. No. 11314-VCS** |
| ENBRIDGE ENERGY COMPANY, INC.; ENBRIDGE, INC.; ENBRIDGE ENERGY MANAGEMENT, L.L.C.; JERREY A. CONNELLY; REBECCA B. ROBERTS; DAN A. WESTBROOK; J. RICHARD BIRD; J. HERBERT ENGLAND; C. GREGORY HARPER; D. GUY JARVIS; MARK A. MAKI; JOHN K. WHELEN; ENBRIDGE PIPELINES (ALBERTA CLIPPER) L.L.C. and ENBRIDGE ENERGY, LIMITED PARTNERSHIP, | : : : : : : : : : : : | |
| Defendants. | : : | |

## MEMORANDUM OPINION

Date Submitted:  November 18, 2015
Date Decided:  April 29, 2016

Jessica Zeldin, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware, and Jeffrey H. Squire, Esquire, Lawrence P. Eagel, Esquire, and David J. Stone, Esquire of Bragar Eagel & Squire, P.C., New York, New York, Attorneys for Plaintiff.

Thomas W. Briggs, Jr., Esquire and Richard Li, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Kevin C. Logue, Esquire, Kevin P. Broughel, Esquire, and Inna Coleman, Esquire of Paul Hastings LLP, New York, New York, Attorneys for Defendants Enbridge Energy Company, Inc., Enbridge Energy Management, L.L.C., Jeffrey A. Connelly, Rebecca B. Roberts, Dan A. Westbrook, Enbridge Energy Limited Partnership, and Nominal Defendant Enbridge Energy Partners, L.P.

Raymond J. DiCamillo, Esquire, J. Scott Pritchard, Esquire, and Shawna C. Bray, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, and Michael H. Steinberg, Esquire of Sullivan & Cromwell LLP, Los Angeles, California, and Laura K. Oswell, Esquire of Sullivan & Cromwell LLP, Palo Alto, California, Attorneys for Defendants Enbridge Inc., J. Richard Bird, J. Herbert England, C. Gregory Harper, D. Guy Jarvis, Mark A. Maki, John K. Whelen, and Enbridge Pipelines (Alberta Clipper) L.L.C.

SLIGHTS, Vice Chancellor

Plaintiff is an investor in a master limited partnership, Enbridge Energy Partners, L.P. ("EEP" or the "Partnership"). He has brought class and derivative claims against the general partner and its controller, affiliates and directors alleging, *inter alia*, that they breached, variously, the operative limited partnership agreement, the implied covenant of good faith and fair dealing and default fiduciary duties by causing the Partnership to reacquire a substantial asset from the general partner in a conflicted transaction, at an unfair price and on terms unfair to the unaffiliated unitholders. In bringing these claims Plaintiff invites the Court to return to familiar quarters—familiar not only because this is the latest in a "series" of cases where an investor in a master limited partnership alleges that the managing general partner engaged in conduct not sanctioned by the operative limited partnership agreement or common law duties,[1] but also because the very agreement to be construed here was recently interpreted by this Court and our Supreme Court in connection with a related dispute involving most of these same parties.

The asset in question is an interest in a crude oil pipeline the general partner acquired from the Partnership only six years prior to the transaction at issue here. Plaintiff challenged that sale and, thus, caused the Court to review the various

---

[1] *See In re Encore Energy P'rs LP Unitholder Litig.*, 2012 WL 3792997, at *1 (Del. Ch. Aug. 31, 2012) (collecting cases in the "series").

1

defendants' roles in approving the transaction against the standards of conduct established by a limited partnership agreement identical in all material respects to the agreement *sub judice*. This Court dismissed Plaintiff's complaint after concluding that the limited partnership agreement effectively replaced all fiduciary duties with a contractual governance scheme and that Plaintiff had failed to plead a violation of the only contractual standard by which the defendants' conduct could be measured: bad faith.[2]

In this action, Plaintiff seeks an order (1) directing Defendants to account to EEP and the public unitholders for damages incurred and profits and benefits Defendants obtained as a result of the alleged wrongs; and (2) directing Defendants to pay money damages, disgorgement, and restitution to EEP and the public unitholders or their successors, assigns, and transferees (the "Class") for all value gained as a result of the alleged wrongs; or alternatively, (3) rescinding the transaction, reforming the terms of the transaction, reforming the Seventh Amended and Restated Agreement of Limited Partnership of Enbridge Energy

---

[2] *Brinckerhoff v. Enbridge Energy Co.*, 2011 WL 4599654, at *8–9 (Del. Ch. Sept. 30, 2011) ("*Brinckerhoff I*"), *aff'd*, 67 A.3d 369 (Del. 2013) ("*Brinckerhoff III*"). *See also Brinckerhoff v. Enbridge Energy Co.*, 2012 WL 1931242 (Del. Ch. May 25, 2012) ("*Brinckerhoff II*") (addressing Plaintiff's rescission and reformation claims).

Partners, L.P. (the "7th LPA"),[3] or awarding rescissory damages to the Partnership and the Class.[4]

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state claims upon which relief can be granted. They also seek dismissal of Plaintiff's derivative claims under Court of Chancery Rule 23.1 for failure to plead facts that would excuse demand. In their Rule 12(b)(6) motions, Defendants repeat most of the contractual arguments they advanced successfully in *Brinckerhoff I*. These arguments, which are grounded in the now-settled tenet that a limited partnership agreement may eliminate the fiduciary duties owed by the general partner to the partnership and its limited partners in favor of contractual duties, resonate with equal effect in this case.

For the reasons that follow, I conclude that the general partner complied in all respects with the provisions of the limited partnership agreement, just as it did in *Brinckerhoff I*, and that it and the other defendants cannot be held liable for money damages unless Plaintiff has well-pled that they acted in bad faith. He has not. Nor has Plaintiff pled sustainable claims for breach of the implied covenant of good faith and fair dealing, breach of residual fiduciary duties or entitlement to

---

[3] Pl.'s Answering Br. in Opposition to Defs.' Mots. to Dismiss Compl. ("Pl.'s Answering Br.") Ex. A ("7th LPA") § 5.2(i).

[4] Verified Class Action and Derivative Compl. ("Compl." or the "Complaint"), prayers for relief.

reformation or rescission. Accordingly, Defendants' motions to dismiss must be granted.

## I. BACKGROUND

The facts are drawn from the Complaint, the operative limited partnership agreements, other documents that are integral to the Complaint and matters of which the Court may take judicial notice.[5]

### A. The Parties

Plaintiff Peter Brinckerhoff ("Brinckerhoff" or "Plaintiff"), individually and as trustee of the Peter R. Brinckerhoff Rev. Tr. U.A. DTD 10/17/97 (the "Trust"), brings this action directly on behalf of himself and a class of similarly situated holders of EEP's Class A common units (excluding the defendants and affiliates, the "Public Unitholders"), and derivatively on behalf of EEP against EEP's General Partner, Enbridge Energy Company, Inc. ("EEP GP"), EEP's designated manager, Enbridge Energy Management, L.L.C. ("Enbridge Management"), EEP GP's controlling parent, Enbridge, Inc. ("Enbridge"), and the shared directors of EEP GP and Enbridge Management, as well as the parties to certain agreements

---

[5] *See Pfeiffer v. Toll*, 989 A.2d 683, 684 (Del. Ch. 2010) (noting that "[t]he facts are drawn from the allegations of the Complaint, from publicly available documents it incorporates by reference, and from information subject to judicial notice, such as the historical prices at which securities traded on the public markets"); *Orman v. Cullman*, 794 A.2d 5, 16 (Del. Ch. 2002) (holding that the Court may consider information that is "integral" to Plaintiff's claims which includes any document that is a "source for the . . . facts as pled in the complaint").

that Plaintiff seeks to reform—Enbridge Pipelines (Alberta Clipper) L.L.C. and Enbridge Energy, Limited Partnership (together, the "Defendants"). The Trust has owned EEP Class A common limited partnership units continuously since December 26, 2008, and owned 73,080 such units at the time Plaintiff filed the Complaint.

EEP is a Delaware master limited partnership ("MLP") headquartered in Houston, Texas. Formed in 1991, EEP owns and operates the Lakehead pipeline system—the United States portion of a crude oil and liquid petroleum pipeline system traversing portions of Canada and the United States. EEP's Class A common limited partnership units trade on the New York Stock Exchange, and it reported $17.7 billion in assets and $371.8 million of net income in 2014. At the time of the transaction that gives rise to the Complaint, the rights and obligations of the general and limited partners of EEP were set forth in the Sixth Amended and Restated Agreement of Limited Partnership of Enbridge Energy Partners, L.P. (the "LPA").

EEP GP, EEP's general partner, is a Delaware corporation wholly owned by Enbridge. As of the date of the Complaint, EEP GP owned a 2% general partnership interest and a 38.1% limited partnership interest in EEP. EEP GP also owns 100% of the voting shares and 11.7% of the listed shares of Enbridge Management which, in turn, owns a 14.7% limited partnership interest in EEP. In

5

October 2002, EEP GP delegated to Enbridge Management its authority to manage EEP.[6] Each EEP GP director and officer is employed in the same capacity at Enbridge Management.

Enbridge is a Canadian energy corporation engaged in "pipeline oil transportation; natural gas gathering, processing, transportation, and storage; [natural gas liquid] fractionation (or separation), transportation, storage and import and export terminaling; and offshore production platform services."[7] Enbridge owns the Canadian portion of the Lakehead pipeline system, and controls EEP GP, Enbridge Management, and EEP.[8] Through its control of EEP GP and Enbridge Management, Enbridge controls a 2% general partnership interest and a 52.8% limited partnership interest in EEP. The following chart depicts the relationships between EEP, EEP GP, Enbridge Management, and Enbridge:

---

[6] Enbridge Management's business consists solely of managing the business and affairs of EEP.

[7] Compl. ¶ 24.

[8] The Lakehead pipeline system extends "from the tar sands oil production fields in Northern Alberta in Western Canada through the upper and lower Great Lakes region of the United States to eastern Canada." *Id.* ¶ 21.



At the time of the transaction at issue, Jeffrey A. Connelly, Rebecca B. Roberts, Dan A. Westbrook, J. Richard Bird, J. Herbert England, C. Gregory Harper, D. Guy Jarvis, Mark A. Maki, and John K. Whelen (the "Director Defendants") each served as directors and, in some cases, officers of both EEP GP and Enbridge Management.[9] Roberts, Connelly and Westbrook comprised the special committee that recommended the transaction at issue to the EEP GP Board.[10]

---

[9] "Enbridge establishes the types and amounts of compensation granted to the officers of EEP and Enbridge Management, all of whom are employed by Enbridge Employee Services, Inc. . . . ., a company 100% owned by Enbridge." *Id.* ¶ 27.

[10] *Id.* ¶ 52.

**B. The 2009 Transaction and Subsequent Litigation (*Brinckerhoff I-III*)**

In early 2009, while in the midst of the so-called "great recession," EEP developed the Alberta Clipper project ("ACP") as a means to address anticipated demands for petroleum in the Midwestern United States by delivering petroleum to that region from growing supplies in the Western Canada oil sands.[11] Given the volatility in the world markets, EEP was open to sharing the $1.2 billion implementation costs with a strategic partner.[12] In April 2009, Enbridge proposed a joint venture agreement to EEP pursuant to which Enbridge would contribute 75% of the costs of the ACP, EEP would contribute 25%, and both parties would share profits in relation to their respective capital contributions (the "JVA").[13]

Upon receiving Enbridge's proposal, EEP GP's Board formed a special committee and directed it to determine whether the JVA was "fair and reasonable to [EEP] and its unit holders."[14] The special committee, in turn, hired legal and financial advisors and thereafter met with its advisors on several occasions to study the JVA and evaluate whether its terms were "representative of an arm's length transaction."[15] Ultimately, the special committee recommended that EEP proceed

---

[11] *See Brinckerhoff I,* 2011 WL 4599654, at *2.

[12] *Id.*

[13] *Id.*

[14] *Id.* (internal quotation marks omitted).

[15] *Id.* (internal quotation marks omitted).

with the JVA if Enbridge would agree that EEP could retain a 33-1/3% (as opposed to 25%) equity stake in the ACP.[16] Enbridge agreed and EEP GP's Board passed a resolution approving the JVA shortly thereafter (hereinafter "the 2009 Sale").[17] The closing price Enbridge paid for its interest in the ACP (the "AC Interest"), $800 million, represented a 7x EBITDA multiple, even though the special committee's financial advisor typically recommended a forward year EBITDA multiple for pipeline projects of 9x–12x.[18]

In response to the 2009 Sale, Brinckerhoff filed a complaint in this Court in which he asserted derivative and direct claims against most of the same defendants named here. The gravamen of his complaint was that the JVA was unfair to unaffiliated unitholders because EEP GP, through a flawed special committee process, allowed Enbridge to pay too little for the AC Interest. The essential counts in *Brinckerhoff I*—breach of express and implied duties under the operative limited partnership agreement, breach of default fiduciary duties and breach of the implied covenant of good faith and fair dealing—mirror the principal claims set forth in the Complaint.[19]

---

[16] *Id.* at *3.

[17] *Id.*

[18] *Id.*

[19] *Id.* at *4.

To address the defendants' motions to dismiss, the Court in *Brinckerhoff I* engaged in a thorough analysis of nearly all of the contractual provisions within the LPA relating to partnership governance that are at issue here. As discussed in more detail below, the Court determined that several provisions of the LPA operated in concert to replace all common law duties, particularly default fiduciary duties, with a more indulgent contractual scheme by which the defendants' conduct must be measured.[20] Because Brinckerhoff failed to plead facts allowing a reasonable inference that the defendants failed to fulfill their contractual duties to the unitholders, the Court dismissed the complaint.[21] The Supreme Court affirmed.[22]

### C. The Repurchase of the AC Interest

The Complaint alleges that between 2009 and 2015 the AC Interest's value declined, as evidenced by a near 20% decrease in projected EBITDA due to an "almost 50%" drop in the price of Canadian crude oil, a six year reduction in time during which the AC Interest would operate under the current tariffs (set to expire

---

[20] *Id.* at *8–10.

[21] *Id.* at *11–12. *Brinckerhoff II* addressed a remand order from the Supreme Court that instructed this Court to consider whether Brinckerhoff was entitled to pursue his claims for reformation or rescission. This Court determined that he was not and the Supreme Court affirmed that ruling as well. *Brinckerhoff II*, 2012 WL 1931242, at *4; *Brinckerhoff III,* 67 A.3d at 373.

[22] *Brinckerhoff III,* 67 A.3d at 372–73.

in 2025), and the expected "rebasing" of the tariff agreement.[23] In this context, five years after Enbridge had acquired the AC Interest, with the recovery of the financial markets well underway and the Alberta Clipper pipeline constructed and operational, Enbridge and EEP determined it was time to explore whether EEP should reacquire the AC Interest.

On September 16, 2014, Enbridge proposed a sale of the AC Interest, excluding the expansion rights,[24] back to EEP for a total price of $915 million (later increased to $1 billion). The proposed purchase price consisted of "a new class of EEP partnership securities to be designated as 'Class E Units,' valued at $694 million, and the repayment of an outstanding loan made by [EEP GP] to EEP in the amount of $306 million."[25] Also, as part of the transaction, EEP GP would amend the LPA "so as to allocate to the Public Unitholders significant items of gross income that [would otherwise] have been allocated to [EEP GP]" (the "Special Tax Allocation").[26]

---

[23] Compl. ¶¶ 6, 64.

[24] According to the Complaint, the expansion rights are significant because they had the potential to "increase Alberta Clipper (US)'s throughput capacity from 450,000 bpd [barrels per day] to 800,000 bpd." *Id.* ¶ 7. *See also id.* ¶¶ 5, 70.

[25] *Id.* ¶ 5.

[26] *Id.* ¶ 2. The Special Tax Allocation allocated to Class A and B common units and Class D units of the Partnership (including those held by EEP GP) "gross income that would otherwise be allocated to the newly created Class E units, in an annual amount equal to $40 million for 22 years (or $880 million total), and then approximately $20 million per year thereafter in perpetuity." *Id.* The portion of the Special Tax Allocation affecting Public Unitholders (*i.e.*, excluding EEP GP's units) amounts to "approximately

11

### 1. The Special Committee

In response to Enbridge's proposal, Enbridge Management (as designated manager for EEP GP), on behalf of EEP, formed a special committee consisting of defendants Connelly, Roberts and Westbrook (the "Special Committee").[27] The Special Committee's charge was to consider whether the terms of the offer were fair and reasonable to EEP and its unitholders and whether EEP should proceed with the proposed transaction or seek alternatives. The Special Committee hired legal counsel and Simmons & Company International ("Simmons"), an investment banking firm with particular expertise in the energy industry, as its financial advisor. Simmons was to be paid a cash fee of $600,000, all but $100,000 of which was contingent on Simmons delivering a fairness opinion.

Simmons' process included the identification and evaluation of more than two dozen comparable transactions,[28] with a particular emphasis on comparable EBITDA multiples,[29] consideration of alternative transaction structures,[30]

---

$24.8 million of additional gross income, per year, for 22 years (or $545.6 million total), and then approximately $12.4 million per year thereafter in perpetuity." *Id.* As Plaintiff correctly observes, the Special Tax Allocation increases the proportion of Partnership income taxes for which Class A and B common unit holders and Class D unit holders are responsible, without the benefit of receiving distributions in that proportion.

[27] "Connelly and Westbrook also served on the special committee for the 2009 [Sale]." *Id.* Brinckerhoff alleges that each Special Committee member had close ties to Enbridge, and that, in March 2015, Roberts was appointed as a director of Enbridge.

[28] Compl. Ex. B ("Simmons Report") at EEPLP000323.

[29] *Id.* at EEPLP000321.

"[m]ultiple due diligence calls with Enbridge management to discuss financial projections and Transaction tax treatment,"[31] and several meetings with the Special Committee during which it made detailed presentations, including at least three that addressed the Special Tax Allocation.[32] The Simmons presentations did not, however, reference the 2009 Sale, sale price, or EBITDA multiple.

During a presentation on December 23, 2014, Simmons explained to the Special Committee that, "[a]t the updated proposed transaction value of $1 billion, [EEP GP] is projected to have a large taxable gain of $410 million on the sale of its units in Alberta Clipper."[33] To be cash neutral, the presentation continued, "the taxable gain will be allocated to the EEP A, B, and D unit[] holders," though Enbridge planned to partially offset the increased tax burden by allocating additional "depreciation to the A, B, and D units."[34] Simmons informed the Special Committee "that the Special Tax Allocation would negate most of the accretion the Public Unitholders would otherwise obtain from the Transaction."[35]

---

[30] *Id.* at EEPLP000288.

[31] *Id.*

[32] Compl. ¶¶ 56, 59, 68; Simmons Report at EEPLP000288.

[33] Compl. ¶ 57 (incorporating Simmons' presentation).

[34] *Id.* ¶¶ 57–58.

[35] *Id.* ¶ 59.

## 2. The EEP GP Board Approves the Transaction

Simmons issued its findings on December 23, 2014, and concluded that "the Transaction is fair to [EEP] and to the holders of [EEP's] common units (other than [EEP GP] and its affiliates) from a financial point of view" (the "Fairness Opinion").[36] The Special Committee recommended and the EEP GP Board approved the transaction the same day. On January 2, 2015, EEP repurchased from EEP GP the AC Interest, excluding the Alberta Clipper (US) expansion rights, for $1 billion (the "Transaction").[37] As part of the Transaction, EEP GP amended the LPA to add Section 5.2(i), which effectuated the Special Tax Allocation.[38]

---

[36] Opening Br. in Supp. of Enbridge Energy Co., Inc., Enbridge Energy Mgmt., L.L.C., Jeffrey A. Connelly, Rebecca B. Roberts, Dan A. Westbrook, Enbridge Energy Ltd. P'ship and Nominal Def. Enbridge Energy P'rs, L.P.'s Mot. to Dismiss the Verified Class and Derivative Compl. ("Enbridge Opening Br.") Ex. 2.

[37] The market responded to the announcement of the Transaction "with an increase in [common unit] price of approximately 6.2% (38.09 to 40.45)," which "remained unchanged even one month following the announcement of the Transaction, where the price closed at 40.09." Enbridge Opening Br. 34–35. *See In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 656 n.65 (Del. Ch. 2008) ("The court may take judicial notice of the trading price of a listed stock.").

[38] 7th LPA § 5.2(i). But for the addition of Section 5.2(i) to the LPA, "items of Partnership income, gain, loss, deduction and credit would have been allocated to the Class A Common Units, Class B Common Units, Class D Units and Class E Units, on a pro rata basis." Compl. ¶ 47.

**D. The Limited Partnership Agreement**

The LPA governed EEP GP's authority to approve the Transaction on behalf of EEP. Relevant to this dispute are the provisions establishing EEP's governance structure and the provisions Brinckerhoff has invoked to challenge certain elements of the Transaction.

**1. The Contractual Governance Scheme**

Article VI of the LPA addressed the "Management and Operation of [the] Business." At Section 6.10(d), the parties expressly agreed that common law duties otherwise owed by EEP GP to EEP and the Public Unitholders, including fiduciary duties, would be displaced by a contractual "standard of care":

> Any standard of care and duty imposed by this Agreement or under the Delaware Act or any applicable law, rule or regulation shall be modified, waived or limited as required to permit the General Partner to act under this Agreement or any other agreement contemplated by this Agreement and to make any decision pursuant to the authority prescribed in this Agreement, so long as such action is reasonably believed by the General Partner to be in the best interests of the Partnership.

Section 6.8, in turn, defines the "standard of care" to which EEP GP and its officers, directors, employees and Affiliates ("Indemnitees") would be held accountable by providing: "no Indemnitee shall be liable for monetary damages to the Partnership, the Limited Partners, the Assignees or any other Persons who have acquired interests in the Units, for losses sustained or liabilities incurred as a result

of any act or omission if such Indemnitee acted in good faith."[39]  Section 6.10(b)

provides that any act taken by EEP GP in reliance on an advisor is "conclusively

presumed to have been done . . . in good faith."

Section 6.9(a) evinces that the parties anticipated potential conflict of interest

transactions between EEP GP and EEP.  It expressly provides that any conflict of

interest would "not constitute a breach of this Agreement . . . if the resolution or

course of action is or, by operation of this Agreement, is deemed to be, fair and

reasonable to the Partnership."  Section 6.9(c) provides that when a transaction "is

required under this Agreement to be 'fair and reasonable' to any Person, the fair

and reasonable nature of such transaction . . . shall be considered in the context of

all similar or related transactions."  With regard to conflict of interest transactions

specifically, Section 6.6(e) provides that the "fair and reasonable" standard is met

"as to any transaction the terms of which are no less favorable to the Partnership

than those generally being provided to or available from unrelated third parties."

When determining whether to enter into a conflicted transaction,

Section 6.9(a) makes clear that EEP GP is not required "to consider the interests of

---

[39] LPA § 6.8(a).  The LPA defines "Indemnitee" as [EEP GP], an "Affiliate of . . . [EEP GP] . . ., [or] any Person who is or was an officer, director, employee, [or] partner . . . of . . . [EEP GP or any Affiliate]."  *Id.* at Article II.  It further defines "Affiliate" as any "Person that directly or indirectly controls, is controlled by or is under common control with, the Person in question."  *Id.*  Enbridge and Enbridge Management are Affiliates of EEP GP.

16

any Person other than the Partnership." Further, when resolving conflicts, Section 6.9(a) allows EEP GP to consider, *inter alia*, the "relative interests of any party to such conflict," "customary or accepted industry practices," "generally accepted accounting . . . practices" and "such additional factors as [EEP GP] determines in its sole discretion to be relevant, reasonable or appropriate under the circumstances." In those instances where the General Partner is authorized to make a decision in its "sole discretion," Section 6.9(b) states that EEP GP and its Affiliates are obliged to "consider only such interests and factors as [they] desire[]" and are under "no duty or obligation to give any consideration to any interest of, or factors affecting, the Partnership, any Subsidiary, any Limited Partner or any Assignee."

Section 6.9(a) further limits EEP GP's liability in the context of conflict transactions by providing:

> In the absence of bad faith by the General Partner, the resolution, action or terms so made, taken or provided by the General Partner with respect to such matter shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other law, rule or regulation.

Consistent with Section 6.9(a), Section 6.9(b) reiterates that when the LPA directs EEP GP to act in "good faith," EEP GP "shall act under such express standard and shall not be subject to any other or different standards imposed

17

by this Agreement, any Subsidiary Agreement … or under the Delaware [limited partnership] Act or any other law, rule or regulation."

## 2. Amendments to the LPA, the Issuance of New Securities and Allocation of Income to Unitholders

Article 15 governs amendments to the LPA.  Section 15.1 states

> Each Limited Partner agrees that [EEP GP] . . . without the approval of any Limited Partner or Assignee, may amend any provision of the [LPA] to reflect, . . . (f) subject to the terms of Section 4.4, an amendment that [EEP GP] determines in its sole discretion to be necessary or appropriate in connection with the authorization for issuance of any class or series of Units pursuant to Section 4.4.

At Section 4.4(a), the parties agree that EEP GP may issue additional units, "or classes or series thereof . . . for any Partnership purpose . . . in its sole discretion, all without the approval of any Limited Partners."[40]  Similarly, at Section 4.4(b), the parties agree that

> [n]otwithstanding any provisions of this Agreement to the contrary (other than [provisions not implicated here]) . . . additional Partnership Securities . . . shall be issuable from time to time in one or more classes . . . with such designations, preferences and relative, participating, optional or other special rights . . . as shall be fixed by the General Partner in the exercise of its sole and complete discretion, subject to Delaware law, including, without limitation, (i) the allocations of items of Partnership income, gain, loss, deduction and credit to each such class or series of Partnership securities.

Section 4.4(d) confirms the broad authority granted to EEP GP in Section 15.1(f) with respect to amendments of the LPA by providing that "[EEP GP] is hereby

---

[40] *Id.* at Recitals.

authorized and directed to take all actions that it deems necessary or appropriate in connection with each issuance of Units . . . and to amend this Agreement in any manner that it deems necessary or appropriate to provide for each such issuance."

Section 5.2(c) governs "Allocations for Tax Purposes," and provides that "[f]or the proper administration of the Partnership or for the preservation of uniformity of the Units (or any class or classes thereof), the General Partner shall have sole discretion to . . . (ii) make special allocations for federal income tax purposes of income (including, without limitation, gross income) or deductions," but only if the allocation "would not have a material adverse effect on the Partners, [or] the holders of any class or classes of Units." Similarly, Section 15.3(b) provides that "[n]otwithstanding the provisions of Sections 15.1 and 15.2, no amendment to this Agreement may (i) enlarge the obligations of any Limited Partner without such Limited Partner's consent."[41]

**E. Procedural Posture**

Brinckerhoff filed the Complaint on July 20, 2015, asserting eight claims as a class action on behalf of himself and a class of similarly situated Class A Common unitholders excluding Defendants (as to Counts I–VI), and as a representative action on behalf of EEP (as to all Counts).

In Count I, Brinckerhoff asserts that the Special Committee's approval of the Special Tax Allocation and the attendant amendment to the LPA to include

---

[41] *Id.* § 15.3(b). Each Public Unitholder is a "Limited Partner." Compl. ¶ 41.

Section 5.2(i) (implementing the Special Tax Allocation) amounted to "conscious disregard for the best interests of EEP and its Public Unitholders and [a] breach of the LPA's implied duty of good faith and fair dealing."[42] This count is directed specifically against EEP GP and Enbridge Management.

In Count II, Brinckerhoff asserts that "EEP GP and Enbridge Management, through the actions of the Director Defendants, . . . acted in bad faith when approving the Transaction," and in so doing, violated Section 6.6(e) (requiring conflicted transactions to be on terms "fair and reasonable to the Partnership").[43] Count II further alleges that any purported reliance on Simmons' Fairness Opinion is ineffective because

> [n]o fiduciary acting in good faith would have relied upon the Simmons opinion, which did not consider (i) the terms of the 2009 transaction; (ii) the methodology employed in connection with the 2009 transaction (i.e., relative cost); (iii) the additional value transferred to EEP GP on account of the Special Tax Allocation; and (iv) the withholding of expansion rights previously transferred from EEP to EEP GP as part of the 2009 transaction.[44]

Even if the conclusive presumption of good faith for actions taken in reliance on a consultant's opinion applies, the Complaint alleges that "such presumption would

---

[42] Compl. ¶ 91.

[43] *Id.* ¶¶ 105, 108.

[44] *Id.* ¶ 110.

violate Delaware law which prohibits partnership agreements from eliminating the implied covenant of good faith and fair dealing."[45]

Count III alleges that Enbridge and the Director Defendants breached Section 15.3(b) and the implied covenant of good faith and fair dealing by approving in bad faith the Special Tax Allocation and the implementing amendment to the LPA. According to Brinckerhoff, Enbridge and the Director Defendants "exercised dominion and control over EEP GP and Enbridge Management, . . . [and] were obligated not to cause EEP GP to approve the amendment to the LPA adopting the Special Tax Allocation."[46]

Count IV alleges that Enbridge and the Director Defendants breached Section 6.6(e) by approving in bad faith a transaction "not consistent with terms that would have been generally provided by or available from unrelated third parties."[47] The Complaint further alleges (1) that any reliance on the Simmons Fairness Opinion violated the implied covenant of good faith and fair dealing because the Simmons opinion was "fatally flawed,"[48] and (2) that Enbridge and the Director Defendants exercised "dominion and control" over EEP GP and Enbridge

---

[45] *Id.* ¶ 111.

[46] *Id.* ¶ 118.

[47] *Id.* ¶ 127.

[48] *Id.*

Management to cause them to enter into the Transaction in "conscious disregard for the best interests of EEP and its Public Unitholders."[49]

Counts V and VI allege aiding and abetting breach of contract and tortious interference, respectively, against Enbridge and the Director Defendants. Count VII alleges breach of residual fiduciary duties against all Defendants, and Count VIII seeks equitable relief in the form of reformation or rescission.

In their motions to dismiss, Defendants argue: (1) Counts II and IV fail because the LPA displaced Defendants' fiduciary duties with a contractual good faith standard, Brinckerhoff has failed to plead bad faith and Defendants' reliance on Simmons' Fairness Opinion establishes a conclusive presumption of good faith under Section 6.10(b); (2) Counts I and III fail because the Special Tax Allocation is just one component of a transaction wholly protected from challenge by multiple exculpatory provisions within Article 6; (3) the breach of contract claims (counts I-IV and VIII) against any defendant not a party to the LPA must be dismissed as Delaware law does not permit breach claims against those not parties to the contract; (4) Brinckerhoff cannot rely on the covenant of good faith and fair dealing because it binds only parties to the contract, and because the LPA leaves no "gaps" for the implied covenant to fill; and (5) Counts V through VIII fail

---

[49] *Id.* ¶¶ 130–31.

22

because the Complaint does not state a claim for an underlying breach of contract or otherwise plead facts that would justify the equitable relief requested.

## II. ANALYSIS

Before turning to Defendants' Rule 12(b)(6) motion, the Court must consider whether Brinckerhoff has complied with Court of Chancery Rule 23.1's demand requirements with respect to his derivative claims. If demand is not excused, then the derivative claims must be dismissed regardless of whether they state otherwise actionable claims.

### A. The Complaint Adequately Pleads Demand Futility[50]

To state derivative claims, the Complaint must "set forth with particularity the effort, if any, [Brinckerhoff made] to secure initiation of the action by [EEP GP] or the reasons for not making the effort."[51] In *Brinckerhoff I*, the Court held that "it would have been futile for [Brinckerhoff] to demand that EEP, an entity completely owned by Enbridge, sue Enbridge."[52] The Court went on to hold that

---

[50] "When considering a motion to dismiss under Rule 23.1, this Court affords plaintiffs all reasonable inferences that logically flow from the particularized facts alleged in the complaint." *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 553205, at *4 (Del. Ch. Feb. 29, 2008).

[51] 6 *Del. C.* § 17-1003. *See also Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (holding that a plaintiff must plead "particularized factual statements" demonstrating that demand is excused).

[52] *Brinckerhoff I,* 2011 WL 4599654, at *7; *accord Dean v. Dick*, 1999 WL 413400, at *3 (Del. Ch. June 10, 1999) ("[W]here the *only* party against whom relief is sought is the 100% owner of the party that would be requested to prosecute the lawsuit-what could be closer to beholdenness?").

23

Brinckerhoff had "alleged particularized facts creating a reasonable doubt that a majority of EEP GP's Board was independent of Enbridge and, thus, that it would have been futile for Brinckerhoff to have demanded that EEP GP's Board initiate claims against Enbridge or its affiliates."[53]

EEP's ownership structure is now as it was in *Brinckerhoff I*. The Complaint's allegations regarding demand futility are practically the same as those considered by the Court in *Brinckerhoff I*. With regard to demand futility, therefore, nothing material has changed since *Brinckerhoff I* that would justify a different outcome. Brinckerhoff has again pled sufficient facts to excuse demand upon EEP GP.

Defendants argue that the Court should not stop its demand futility analysis with the entity (EEP GP) but should continue the analysis by considering whether demand upon the EEP GP Board would have been futile. The Court disagrees. As this Court recently held, "an independent board directing the affairs of [a general partner] would not, for these purposes, overcome the consequences to the general partner entity of domination and control by [it's controller's] interests."[54]

---

[53] *Brinckerhoff I,* 2011 WL 4599654, at *7.

[54] *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *13 (Del. Ch. Jan. 18, 2013). *See also Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 1998 WL 832631, at *5 (Del. Ch. Nov. 10, 1998) (holding that, in the limited partnership context, demand futility is addressed against the general partner entity, not its board or its "internal decisionmaking apparatus").

Therefore, the Complaint's identification of "particularized factual statements"[55] that allow a reasonable inference that EEP GP was not independent and free from improper influence are sufficient to excuse the demand requirement.[56]

Even if the Court accepted Defendants' argument that the Complaint must allege futility with respect to EEP GP's Board, the pled facts mandate the same conclusion. Brinckerhoff alleges that six (a majority) of EEP GP's directors were conflicted at the time he filed the Complaint "by virtue of holding simultaneous employment at both EEP GP and Enbridge and/or by being an overlapping director or officer of EEP GP and Enbridge, and/or by being dependent on Enbridge or EEP GP for their compensation."[57] Specifically, the Complaint alleges that England, Bird, Harper, Whelen, and Jarvis, while serving as directors or officers of EEP GP, also served as directors or officers of Enbridge.[58] The Complaint alleges that Maki

---

[55] *Brehm*, 746 A.2d at 254 (Del. 2000).

[56] For instance, the Complaint alleges that "EEP GP and Enbridge Management's Boards are composed of the same individuals, each of whom were appointed by and serve at the pleasure of Enbridge," and that "EEP GP's and Enbridge Management's purportedly independent directors each had close ties to Enbridge." Compl. ¶ 12. The Complaint then alleges that Connelly "has had a long-standing relationship with Enbridge's Chairman, David Arledge," Roberts resigned from the Boards of EEP GP and Enbridge Management [in March 2015] and was appointed to the board of Enbridge," and Westbrook "served [from May 2007 to August 2008] on the Board of Directors of Synenco Energy Inc. . . . together with Patrick Donald Daniel, who, since 1994, was a senior executive officer of Enbridge." *Id.* ¶¶ 28–30.

[57] Pl.'s Answering Br. 61 (citing Compl. ¶ 76).

[58] Compl. ¶ 77. S*ee Brinckerhoff I*, 2011 WL 4599654, at *7 (finding that a director's service both on EEP GP's board and as an officer or director of Enbridge constituted sufficient interestedness to render demand excused as to that director).

"joined Enbridge in 1986 and progressed through a series of accounting and financial roles," including Interim President of Gas Pipelines and other executive-level roles in various Enbridge subsidiaries, and that he is employed and paid by Enbridge Employee Services, Inc., Enbridge's wholly owned subsidiary.[59]

Based on the foregoing, the Court is satisfied that the Complaint pleads particularied facts to excuse demand under 6 *Del. C.* § 17-1003. Defendants' motion to dismiss the derivative claims under Court of Chancery Rule 23.1 must be denied.

## B. The Complaint Fails to State Legally Viable Claims and Must Be Dismissed

### 1. The Rule 12(b)(6) Standard

On a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pled facts in the Complaint and reasonable inferences drawn therefrom, but is not required to adopt "every strained interpretation of the allegations proposed by the plaintiff."[60] The Court will dismiss a complaint pursuant to Chancery Court

---

[59] Compl. ¶ 34. *See also Brinckerhoff I*, 2011 WL 4599654, at *7 (finding an EEP GP officer interested because he was "paid by EES, a company that Enbridge wholly owns"). All EEP, EEP GP, and Enbridge Management officers are employed by Enbridge Employee Services, Inc., a company solely owned by Enbridge. In fact, "[t]he Partnership, EEP GP, and Enbridge Management have no employees of their own." Compl. ¶ 27.

[60] *Malpiede v. Townson*, 780 A.2d 1075, 1082–83 (Del. 2001). *See also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs., LLC,* 27 A.3d 531, 537 (Del. 2011) (confirming that complaints in Delaware may not be dismissed unless the plaintiff would

Rule 12(b)(6) "only where the court determines with 'reasonable certainty' that the plaintiff could prevail on no set of facts that may be inferred from the well-pled allegations in the complaint."[61]

## 2. Giving Maximum Effect to the Principle of Freedom of Contract

Delaware limited partnerships, including MLPs, are governed by the Delaware Revised Uniform Limited Partnership Act (the "DRULPA"),[62] which aims to "give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."[63] In keeping with this principle, the DRULPA "recognizes [that] partners may modify fiduciary duties through contract."[64] Indeed, 6 *Del. C.* § 17-1101(d) "allows MLPs to eliminate completely a general partner's fiduciary duties to common unitholders, subject only to the limited protections of the covenant of good faith and fair dealing."[65] While our

---

not be entitled to recover "under any reasonably conceivable set of circumstances susceptible of proof").

[61] *Id.*

[62] *In re Inergy L.P.*, 2010 WL 4273197, at *12 (Del. Ch. Oct. 29, 2010).

[63] 6 *Del. C.* § 17-1101(c); *accord Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 100 (Del. 2013); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 170 (Del. 2002) ("DRULPA's 'basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement' or 'where the agreement is inconsistent with mandatory statutory provisions.'" (footnote omitted)).

[64] *In re Cencom Cable Income P'rs, L.P. Litig.*, 1996 WL 74726, at *4 (Del. Ch. Feb. 15, 1996); *accord Inergy*, 2010 WL 4273197, at *12.

[65] *Inergy*, 2010 WL 4273197, at *12.

law's contractarian deference "affords commercial parties the advantage of great flexibility to privately order their affairs, . . . that flexibility can come at a cost."[66] Recognizing the "harsh"[67] consequences that may result from such flexibility, the Supreme Court recently reminded "investors in these agreements [to] be careful to read th[e] agreements and . . . understand the limitations on their rights."[68] To that end, investors in MLPs must weigh the risk associated with "[t]he near absence . . . of any duties whatsoever to [the limited partnership's] public equity holders" with the "kind of returns a master limited partnership investment might yield."[69]

Brinckerhoff's claims are rich in allegations of wrongdoing that likely would gain traction if the Defendant's conduct were to be measured under traditional corporate governance standards. His parsing of the LPA likewise would merit detailed, sequential analysis of each of the interrelated provisions to evaluate his claims of breach were his claims under the LPA straightforward breach of contract

---

[66] *Dieckman v. Regency GP LP*, 2016 WL 1223348, at *11 (Del. Ch. Mar. 29, 2016).

[67] *Id.*

[68] *The Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 2016 WL 912184, at *1 (Del. Mar. 10, 2016) (citing *Miller v. Am. Real Estate P'rs, L.P.*, 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001) ("This court has made clear that it will not [be] tempted by the piteous pleas of limited partners who are seeking to escape the consequences of their own decisions to become investors in a partnership whose general partner has clearly exempted itself from traditional fiduciary duties. The DRULPA puts investors on notice that fiduciary duties may be altered by partnership agreements, and therefore that investors should be careful to read partnership agreements before buying units." (footnote omitted))).

[69] *Encore Energy P'rs*, 2012 WL 3792997, at *13.

28

claims. The Complaint, however, presents neither a traditional breach of fiduciary claim nor a straightforward breach of contract claim; the LPA's clear and unequivocal adoption of a good faith standard envelopes each of Brinckerhoff's claims. As discussed below, the Complaint's failure to present well-pled allegations of bad faith is fatal to all claims asserted therein.

### 3. Counts II and IV—The Complaint Fails to State a Claim that Defendants Breached Express or Implied Duties by Failing to Secure a Fair Price for the AC Interest

Brinckerhoff alleges that the Transaction was not "fair and reasonable" under Section 6.6(e) because it was on terms "less favorable to the Partnership than those generally being provided to or available from unrelated third parties."[70] Specifically, Brinckerhoff notes that the price paid by EEP for the AC Interest was "hundreds of millions of dollars above fair value" and at no time did EEP GP, Enbridge Management or Simmons determine that any comparable third-party transaction (1) required Public Unitholders of the purchaser to absorb the seller's tax burden, (2) reserved to the seller valuable expansion rights associated with the underlying transaction, or (3) financed the equity component of the transaction with units consisting of rights similar to the Class E Units, as opposed to common units.[71] He also points to the fact that Simmons failed to consider the 2009 Sale

---

[70] LPA § 6.6(e).

[71] Compl. ¶¶ 102, 104.

when running its comparables analysis and failed to suggest that the Special Committee "consider the cost to the Public Unitholders of the Special Tax Allocation [or the exclusion from the Transaction of the expansion rights] when evaluating the fairness of the [Transaction price]."[72]

In arguing that the Transaction is neither "fair" nor "reasonable" to the Partnership, Brinckerhoff reminds the Court that, in a prior decision, the Court interpreted Section 6.6(e) "as requiring something similar, if not equivalent, to entire fairness review."[73] Brinckerhoff correctly observes that where a transaction is required under the LPA to be "fair and reasonable," the "fair and reasonable nature of such transaction . . . shall be considered in the context of all similar or related transactions."[74] He argues that consideration of the 2009 Sale is indispensable to a proper review of the fairness of the Transaction under Section 6.9(c) (requiring consideration of "all similar or related transactions").[75] In light of these contractual standards, Brinckerhoff concludes, the Complaint's detailed description of Defendants' role in causing EEP to sell the AC Interest (minus the expansion rights) back to EEP GP for $200 million more than the 2009

---

[72] *Id.* ¶¶ 66–69. In fact, Simmons' opinion letter "did not mention the Special Tax Allocation[] or the exclusion of the expansion rights." *Id.* ¶ 71.

[73] *Brinckerhoff II,* 2012 WL 1931242, at *2; Compl. ¶ 102.

[74] LPA § 6.9(c).

[75] Brinckerhoff alleges that the Simmons "presentations to the Special Committee did not make any reference to the 2009 sale." Compl. ¶ 66.

30

Sale, at a price that does not include the value of the Special Tax Allocation to EEP GP and following a highly flawed Special Committee review, is more than adequate to state a "claim that the [Transaction] price was not fair and reasonable to the Partnership."[76]

Defendants riposte that Brinckerhoff's challenge to the fairness of the price is not well-pled for two basic reasons: (1) Section 6.6(e) must be read together with Section 6.8(a) which limits the Defendants' liability to decisions made in bad faith, and (2) the Defendants were entitled to a presumption of good faith. The Court agrees.[77]

### a. The LPA Requires Brinckerhoff to Plead Bad Faith

With Section 17-1101(c)'s express deference to the "principle of freedom of contract" in mind, the Court's "first task" in determining the nature and scope of duties owed between investors and general partners in a limited partnership is to construe the limited partnership agreement, if there is one.[78] "The proper interpretation of a contract, although analytically a question of fact, is considered a

---

[76] Pl.'s Answering Br. 40–42.

[77] To the extent Brinckerhoff's claims against the defendants other than EEP GP sound in breach of contract, the claims fail as a matter of law as Delaware does not recognize breach of contract claims against non-parties to the contract. *In re Kinder Morgan, Inc. Corporate Reorganization Litig.*, 2015 WL 4975270, at *5 (Del. Ch. Aug. 20, 2015) (holding that "only a party to a contract may be sued for breach of that contract" and dismissing claims of breach of a limited partnership agreement as to defendants other than the general partner (citation omitted)).

[78] *Encore Energy P'rs*, 2012 WL 3792997, at *7.

31

question of law."[79]   Before addressing the validity of Brinckerhoff's claims, therefore, it is appropriate first to construe the LPA.  In so doing, the Court applies general rules of contract interpretation,[80] and seeks to interpret language "consistently with past precedents interpreting identical language."[81]   As noted, several of the relevant provisions of the LPA already have been interpreted by this Court and again *de novo* by our Supreme Court.  The Court does not approach its contract construction duties with a *tabula rasa*.

According to Section 6.6(e), EEP GP was authorized to approve the Transaction, notwithstanding the acknowledged conflict of interest, if it determined that the Transaction was "fair and reasonable to the Partnership."  When assessing the fairness and reasonableness of the Transaction, EEP GP was to consider comparable transactions to ensure that the terms being offered EEP were "no less favorable . . . than those generally being provided to or available from unrelated third parties."[82]   While EEP GP was obliged to consider the interests of the Partnership when determining whether to approve a transaction between EEP GP

---

[79] *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del. 2009), *as corrected* (Nov. 30, 2009).

[80] *Cantera v. Marriott Senior Living Servs., Inc.*, 1999 WL 118823, at *3 (Del. Ch. Feb. 18, 1999) ("[I]t is . . . well settled that Delaware courts apply rules of contract interpretation to limited partnership agreements.").

[81] *Encore Energy P'rs*, 2012 WL 3792997, at *8 ("Where the relevant contractual language is identical, the Delaware Supreme Court and sound public policy instruct trial courts to interpret such language consistently from case to case.").

[82] LPA § 6.6(e)(iii).

and EEP, it was under no obligation and, in fact, was expressly relieved of any obligation to consider the interest of Limited Partners.[83]

The LPA, however, "does not stop there"; through a series of interrelated provisions, the LPA "broadly limits" the duties Defendants owe EEP and its unitholders.[84] These provisions, by their terms, are directed at the conduct of EEP GP, but they also cloak Enbridge and Enbridge Management as "Affiliates" of EEP GP[85] and the directors and officers of EEP GP as "Indemnitees"[86] with identical protections.[87]

To be sure, Brinckerhoff is correct when he observes that EEP GP's authorization of the Transaction was subject to the requirement that the Transaction be "fair and reasonable to the Partnership."[88] But Brinckerhoff misses the mark when he urges the Court to consider the propriety of the Defendants' role in approving the Transaction only within the isolated framework of Section 6.6(e).

---

[83] *Id.* § 6.9(a). *See Brinckerhoff I*, 2011 WL 4599654, at *8–9; *In re Kinder Morgan, Inc.*, 2015 WL 4975270, at *7 (construing very similar language); *Gelfman v. Weeden Invs., L.P.*, 792 A.2d 977, 986 (Del. Ch. 2001) (same).

[84] *Brinckerhoff I*, 2011 WL 4599654, at *8.

[85] LPA Article II; *Brinckerhoff I*, 2011 WL 4599654, at *8.

[86] LPA Article II; *Brinckerhoff I*, 2011 WL 4599654, at *9.

[87] *Brinckerhoff I*, 2011 WL 4599654, at *9 (holding that, when read together, Section 6.8(a) and the LPA's definitions of "Indemnitee" and "Affiliate" extend the protections inherent in the "good faith" standard to all Defendants); *accord Brinckerhoff III,* 67 A.3d at 372.

[88] LPA §6.6(e).

That argument was advanced in *Brinckerhoff I* and rejected. Instead, in *Brinckerhoff I*, this Court considered Plaintiff's claim that the defendants there were liable for violating Section 6.6(e) in the broader context of the governance provisions of the LPA and ultimately held that those provisions modified Section 6.6(e)'s "fair and reasonable" standard.[89] To meet the standard set by Section 6.8 and Section 6.10(d), Plaintiff must "plead facts suggesting that EEP GP's Board acted in bad faith" in its determination that the Transaction was "fair and reasonable to the Partnership."[90]

Brinckerhoff's final attempt to avoid having to plead bad faith rests on a strained reading of *Brinckerhoff II*. Relying on *dicta* from that decision, Brinckerhoff argues that, even assuming the Defendants did not act in bad faith, they still violated the LPA because the "bad faith" standard in Section 6.9(a) of the LPA does not modify Section 6.6(e)'s requirement that the terms of the Transaction be "fair and reasonable."[91] This argument fails for two distinct reasons.

---

[89] 2011 WL 4599654, at *9 ("[T]he only duty that EEP or its unit holders may successfully hold the Defendants monetarily liable for is a breach of the duty to act in good faith").

[90] *Id.* at *4; *accord Brinckerhoff III,* 67 A.3d at 372.

[91] *Brinckerhoff II*, 2012 WL 1931242, at *2 (noting that the Court would not invoke Section 6.9(a)'s "bad faith" clause when construing Section 6.6(e) because Section 6.9(a) was modified by an "[u]nless otherwise expressly provided" clause).

First, in *Brinckerhoff II*, the Court concluded that Section 6.9(a)'s "bad faith" standard did not displace Section 6.6(e)'s "fair and reasonable" standard because "Defendants seem to have conceded for purposes of their motions to dismiss that the 'unless otherwise' language applies to all of Article 6.9(a), and thus, that Article 6.6(e) is not subject to Article 6.9(a)."[92] After acknowledging the Defendant's apparent concession, however, the Court went on to construe Section 6.9(a) as follows: "a plain reading of Article 6.9(a) arguably suggests that the 'unless otherwise' language in Article 6.9(a) does not modify the 'in the absence of bad faith' language, which appears several sentences later in that article."[93] This construction of Section 6.9(a) comports with an objective reading of the two provisions.

Second, and perhaps more importantly, Defendants need not rely upon Section 6.9(a) to avail themselves of the LPA's "good faith" standard. As the Court held in *Brinckerhoff I*, and as the Supreme Court affirmed in *Brinckerhoff III*, Section 6.8(a) works in tandem with other provisions in the LPA to ensure that

---

[92] *Id.* Defendants have made no such concession here and, in fact, have argued persuasively that Brinckerhoff's construction of Sections 6.6(e) and 6.9(a) is flawed. Reply Br. in Supp. of Defs.' Mot. to Dismiss the Verified Class and Derivative Compl. 9-10, n.4.

[93] *Brinckerhoff II*, 2012 WL 1931242, at *2.

35

the Defendants "will not be liable to EEP or its unit holders for *any actions* taken in good faith."[94]

When the "Gordian knot of interrelated standards in different sections" of the LPA is untied,[95] Brinckerhoff is left with the difficult task of pleading facts that allow an inference that Defendants acted in bad faith when they approved or caused EEP to approve the Transaction. That is, he must plead facts that allow an inference that "the decision to enter into the Transaction, under the circumstances, [was] 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"[96]

### b. *Brinckerhoff Has Failed to Plead Bad Faith*

As was true in *Brinckerhoff I*, Brinckerhoff's allegations of bad faith fall short. He has failed to plead facts that allow a reasonably conceivable inference that the Transaction violated Section 6.6(e), much less an inference that the Defendants acted in bad faith.

Upon receipt of Enbridge's offer to sell the AC Interest, Enbridge Management immediately formed a Special Committee comprised of independent

---

[94] *Brinckerhoff I*, 2011 WL 4599654, at *9 (emphasis added); *accord Brinckerhoff III*, 67 A.3d at 372–73.

[95] *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 361 (Del. 2013).

[96] *Brinckerhoff III*, 67 A.3d at 373.

directors to evaluate the Transaction and consider alternatives.[97]  The Special

Committee, in turn, engaged legal and financial advisors to assist in its evaluative

process.  The materials attached to the Complaint, while offering only a narrow

window, reveal clearly that Simmons' review was thorough.[98]  The Court accepts

the Complaint's allegation that Simmons did not consider the 2009 Sale when

rendering its Fairness Opinion.  But Simmons did consider twenty seven

comparable transactions announced between 2011 and 2014, and concluded that

the "[i]mplied transaction value to EBITDA multiple of 10.7x for the Alberta

Clipper is within the range of comparable pipeline transaction multiples reviewed

---

[97] The Complaint alleges that Roberts, one of the three Special Committee members, was not independent because she was appointed in March 2015 as a director of Enbridge.  The appointment of a subsidiary's director to the parent's board three months after she recommended approval of a transaction, however, is not sufficient evidence from which the Court may reasonably infer interestedness at the time the Special Committee was evaluating the Transaction.  *See Orman*, 794 A.2d at 28–29 ("No case has been cited to me, and I have found none, in which a director was found to have a financial interest *solely* because he will be a director in the surviving corporation.  To the contrary, our case law has held that such an interest is not a disqualifying interest.").  Further, the alleged personal connection to Enbridge of the remaining two special committee members, Compl. ¶¶ 28, 30, 79, similarly fails to rise to the level of interestedness.  *Zimmerman v. Crothall*, 2012 WL 707238, at *13 (Del. Ch. Mar. 5, 2012), *as revised* (Mar. 27, 2012) (finding that "allegations of mere friendship and shared work experiences likely fall short of what is necessary to call into question [a director's] independence" absent "financial ties, familial affinity, a particularly close or intimate personal or business affinity or . . . evidence that in the past the relationship caused the director to act non-independently vis-à-vis an interested director" (alteration in original) (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004))).

[98] Simmons Report at EEPLP000288.

37

by Simmons (approximately 10.0x to 12.0x)."[99]  Simmons also met multiple times with the Special Committee and engaged in "[m]ultiple due diligence calls with Enbridge . . . to discuss financial projections and Transaction tax treatment."[100]

At the conclusion of its review, Simmons issued a Fairness Opinion in which it recommended the Transaction to the Special Committee as fair to EEP and its unitholders.  Brinckerhoff's conclusory allegations to the contrary are insufficient to plead bad faith.[101]

### c. *The Defendants Are Entitled to a Presumption of Good Faith*

Section 6.10(b) of the LPA provides that any act taken by EEP GP in reliance on an advisor is "conclusively presumed to have been done . . . in good

---

[99] *Id.* at EEPLP000321, EEPLP000323.  *See Brinckerhoff I*, 2011 WL 4599654, at *10 ("The valuation methodology and comparable transaction analysis that an investment banker undertakes … are properly within the discretion of the investment banker.").

[100] Simmons Report at EEPLP000288.

[101] As this Court observed in *Brinckerhoff I*, given the establishment of an independent special committee and its reliance on a financial advisor's fairness opinion and independent legal counsel, any contrary result would invite the question:

> what would Enbridge have to do to be able to dispose of bad faith claims on a motion to dismiss?  Would Enbridge be required, in analogy to *In re John Q. Hammons Hotels Inc. S'holder Litig.,* 2009 WL 3165613 (Del. Ch. Oct. 2, 2009), to negotiate a transaction with an independent committee *and* have the transaction approved by a majority of the public unit holders?  Requiring Enbridge to put in place those "robust procedural protections," in order to be able to dispose of a bad faith claim on a motion to dismiss, would seem to rewrite the LPA when the Delaware General Assembly has explicitly stated that "[i]t is the policy of [Delaware's Limited Partnership Act] . . . to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."

*Brinckerhoff I*, 2011 WL 4599654, at *10 n.39 (alterations in original).

38

faith." EEP GP approved the Transaction in reliance upon Simmons' Fairness Opinion.[102] It is entitled, therefore, to Section 6.10(b)'s presumption of good faith.[103]

The express terms of Section 6.10(b) suggest that EEP GP alone is entitled to the presumption of good faith. The only reasonable construction of the LPA, however, suggests that Section 6.10(b)'s presumption of good faith radiates beyond EEP GP to the other Defendants as well. As our Supreme Court has explained, a plaintiff "cannot state a cognizable claim for relief against the other defendants for causing [the general partner] to take an action that did not breach [the general partner's] duties under the LPA."[104] After acknowledging that Section 6.10(b)'s good faith presumption applies by its terms only to EEP GP, the Court in *Brinckerhoff I* similarly noted that "[i]t may nevertheless be the case that if a limited partnership agreement expressly permits a corporate general partner to take certain action, . . . the board of that general partner cannot be found to have acted

---

[102] Simmons arrived at its conclusions after evaluating twenty seven comparable transactions announced between 2011 and 2014, Simmons Report at EEPLP000323, analyzing alternative transaction structures and values "as projections and terms changed over the diligence period," *id.* at EEPLP000288, holding multiple due diligence calls and meetings with Enbridge Management and the Special Committee, *id.*; Compl. ¶¶ 56–57, and making various presentations to the Special Committee. Simmons Report at EEPLP000288; Compl. ¶ 59.

[103] Compl. ¶¶ 56–59; Simmons Report at EEPLP000288. *See Brinckerhoff I*, 2011 WL 4599654, at *9.

[104] *Norton*, 67 A.3d at 368.

in bad faith for causing the general partner to take the expressly permitted action."[105]

The Court need not reach the breadth of Section 6.10(b), however, because with or without the presumption, the Complaint has not alleged facts from which the Court may draw a reasonably conceivable inference that EEP GP, EEP GP's Board, Enbridge Management or Enbridge acted in bad faith in connection with the approval of the Transaction. Consequently, Defendants' Motion to Dismiss Counts II and IV must be granted.[106]

### 4. Counts I and III—The Complaint Fails to State a Claim that the Issuance of New Units and the Special Tax Allocation Violated Express or Implied Duties

Brinckerhoff has invoked multiple provisions of the LPA to support his claim that the Defendants' approval of the Special Tax Allocation violated express and implied duties. First, he argues that Section 4.4(b), while authorizing EEP GP to issue "additional Partnership Securities" and fix "allocations of items of Partnership income" with respect to any newly issued Units, did not "allow EEP GP to adversely impact the rights of the *existing* unitholder[s] by increasing the obligations of those unitholders."[107] With regard to the Transaction specifically,

---

[105] *Brinckerhoff I*, 2011 WL 4599654, at *9.

[106] *See Brinckerhoff III*, 67 A.3d at 373 (emphasizing that "the Court of Chancery did not rest its decision solely on the LPA's conclusive presumption that [EEP GP] acted in good faith").

[107] Pl.'s Answering Br. 25 (emphasis added).

Brinckerhoff construes Section 4.4(b) to permit an allocation of income *to* the newly-created Class E units but to prohibit an allocation of income *from* the Class E Unitholder(s) to the existing Public Unitholders.

Second, he argues that the Special Tax Allocation is a "special allocation[]" for federal income tax purposes,"[108] and therefore "subject to the provisions of Section 5.2(c)."[109] Section 5.2(c), in turn, authorizes EEP GP to "make special allocations for federal income tax purposes of income . . . or deductions," but only to the extent such allocations "would not have a material adverse effect on the Partners [or] the holders of any class or classes of Units."[110] The Special Tax Allocation violates Section 5.2(c), Brinckerhoff contends, because it "shifts over $500 million of taxable income from EEP GP to the Public Unitholders over a 22 year period, and then continues, at $12.4 million per year, in perpetuity."[111]

Third, Brinckerhoff argues that the Special Tax Allocation violates Section 15.3(b) by impermissibly "enlarg[ing] the Limited Partners' obligations."[112] Specifically, he argues that it is "plainly 'reasonably conceivable' that plaintiff will prove that the Special Tax Allocation" breached Section 15.3(b)

---

[108] LPA § 5.2(c).

[109] Pl.'s Answering Br. 26.

[110] LPA § 5.2(c).

[111] Pl.'s Answering Br. 27.

[112] *Id.* at 30.

by "negat[ing] most of the accretion to the Public Unitholders [they] would otherwise obtain from the Transaction."[113]

When viewing the Special Tax Allocation in isolation, apart from the LPA's governance provisions, Brinckerhoff's construction of Sections 4.4(b), 5.2(c) and 15.3(b) provide a platform on which "reasonably conceivable" claims of breach might be constructed. Thus, Brinckerhoff has expended much energy to separate the Special Tax Allocation from the broader Transaction, presumably anticipating that the Court might view the Defendants' approval of the Transaction with favor, much as the Court viewed the defendants' approval of the 2009 Sale in *Brinckerhoff I.* To support his contention that the Special Tax Allocation was separate from the Transaction, Brinckerhoff stresses that the Special Tax Allocation was not disclosed with the press release accompanying the issuance of the Class E Units,[114] was not valued by Simmons and constitutes "additional consideration paid to the general partner . . . by the limited partners."[115]

---

[113] *Id.* at 22.

[114] Oral Arg. Tr. 43.

[115] *Id.* at 35. Of course, Simmons was under no duty to consider the Special Tax Allocation separate and apart from the other consideration being offered to EEP in the Transaction. *See Norton,* 67 A.3d at 367–68 (holding that the investment banker engaged by the conflicts committee was not required to evaluate one element of consideration plaintiff alleged was not fair to the partnership "separately from the remaining consideration"); *In re Kinder Morgan, Inc.*, 2015 WL 4975270, at *8 (finding no breach where the transaction at issue included, in part, "the transfer of significant value in the form of tax benefits from the limited partners to the controller"); *In re K-Sea Transp.*

Brinckerhoff's attempt to distance the Special Tax Allocation from the Transaction falters under the weight of his own Complaint and the Simmons report upon which he has relied to support his claims. At the very outset of his Complaint Brinckerhoff acknowledges that the Special Tax Allocation was adopted "as part of the Transaction."[116] This characterization comports with Simmons' view of the Special Tax Allocation; Simmons saw the Special Tax Allocation as a central element of the Transaction the purpose of which was to "make the transaction for [EEP GP] cash neutral."[117] And Simmons leaves no doubt in its Fairness Opinion that it considered the Special Tax Allocation when reaching its conclusion that the Transaction as a whole was "favorable" to EEP and the Public Unitholders.[118]

Having determined that the Special Tax Allocation is an integral component of the overall Transaction, the Court must apply Section 6.8(a)'s good faith standard when reviewing the propriety of Defendants' conduct in adopting or causing EEP to adopt the implementing amendment to the LPA.[119] Against the backdrop of the good faith standard, to state actionable claims against the Defendants, Brinckerhoff must plead not only a breach of the LPA's provisions

_Partners L.P._, 2011 WL 2410395, at \*5–6 (Del. Ch. June 10, 2011) (financial advisor not required to consider fairness of each separate component of the deal).

[116] Compl. ¶ 2.

[117] _Id._; Simmons Report at EEPLP000317.

[118] Simmons Report at EEPLP000315-18, EEPLP000321.

[119] _See supra_ text accompanying note 90.

relating to the issuance of new securities and allocation of Partnership income but also that such breaches were committed in bad faith. Stated differently, Section 6.8(a)'s good faith standard modifies Section 5.2(c)'s "material adverse effect" provision and Section 15.3(b)'s "enlarge the obligations" provision.

Analyzing EEP GP's approval of the Special Tax Allocation in this context, Brinckerhoff's attempts to plead actionable violations of Sections 5.2(c) and 15.3(b) unravel.[120] Brinckerhoff has not even attempted to plead facts from which the Court may reasonably infer that EEP GP, in *bad faith*, created a "material adverse effect on the Partners [or] the holders of any class or classes of Units,"[121] or in *bad faith* "enlarge[d] the obligations of any Limited Partner."[122] In the absence of allegations of a bad faith breach of the LPA—for example, well pled allegations that Simmons or the Special Committee regarded the Special Tax Allocation as harmful to the Partnership or the Public Unitholders in a manner that

---

[120] The Court undertakes this analysis assuming the validity of Brinckerhoff's construction of Section 4.4(b), *i.e.*, that EEP GP was not expressly authorized to allocate income from newly issued units to existing units. The absence of express authorization in Section 4.4(b) to allocate income to existing units, however, does not *ipso jure* require a finding that doing so would result in a breach of the LPA. This is particularly so when other provisions of the LPA—*e.g.* Sections 4.4(d), 5.2(c) and 15.1(f)—suggest that EEP GP was authorized to implement the Special Tax Allocation. The Court need not go down this road, however, given its determination that the Special Tax Allocation is a component of the properly authorized Transaction.

[121] LPA § 5.2(c).

[122] *Id.* § 15.3(b).

rendered the Transaction unfair to either—Defendants are shielded from liability for any adverse effect or obligation created by the Special Tax Allocation.[123]

To the contrary, however, EEP GP relied on its Special Committee which studied the Transaction and properly considered Simmons' Fairness Opinion. That Fairness Opinion treated the Special Tax Allocation as a component of the Transaction and described the Transaction as "favorable."[124] Analyzed in this context, Brinckerhoff has failed to plead that EEP GP's adoption of the Special Tax Allocation violated the LPA. Accordingly, Defendants' Motion to Dismiss Counts I and III must be granted.[125]

---

[123] This Court recently held that a provision nearly identical to Section 6.10(d) of the LPA "eliminate[d] all common law fiduciary duties and substitute[d] in their place a *contractual* duty under which the General Partner 'must reasonably believe that its action is in the best interest of, or not inconsistent with, the best interests of the Partnership.'" *In re Kinder Morgan, Inc.*, 2015 WL 4975270, at *5. The Court concluded that the provision "establishes 'a free-standing, enigmatic standard of good faith' which requires 'a reasonable belief' on the part of the General Partner." *Id.* (citation omitted). Further, where an LPA exculpates "all the Defendants" so long as they "acted in 'good faith,' . . . in order to state a claim that withstands Rule 12(b)(6), [the plaintiff] must allege facts supporting an inference that [the general partner] had reason to believe that it acted inconsistently with the Partnership's best interests." *Norton*, 67 A.3d at 362.

[124] *See supra* text accompanying note 118.

[125] In response to this conclusion, one might reasonably ask whether EEP GP, as a practical matter, is relieved of all obligations to act in compliance with the detailed provisions of a limited partnership agreement that comprehensively address nearly all aspects of the relationship between the general and limited partners. The short answer to that question is no. EEP GP has committed to the Public Unitholders that it will act in good faith. In the context of the broader Transaction, Brinckerhoff has failed to allege well-pled facts that EEP GP and its Affiliates acted in bad faith by determining that the Special Tax Allocation, as a component of consideration, violated Sections 5.2(c) or 15.3(b). In isolation, however, separated from the overall benefits of the Transaction, the

45

## 5. Plaintiff Cannot Invoke the Implied Covenant of Good Faith and Fair Dealing

Brinckerhoff accurately points out that the LPA's contractual limitations of liability cannot, as a matter of law, extend to claims that Defendants breached the implied covenant of good faith and fair dealing.[126]  Nevertheless, Plaintiff's implied covenant claims fail as a matter of law.[127]

"[T]he implied covenant of good faith and fair dealing . . . is 'a limited and extraordinary legal remedy' that addresses only events that could not reasonably have been anticipated at the time the parties contracted."[128]  "When presented with an implied covenant claim, a court first must engage in the process of contractual construction to determine whether there is a gap that needs to be filled."[129]  The implied covenant will not "override the express terms of the contract," nor will it replicate fiduciary review, particularly when the contract supplants traditional governance structures.[130]

---

Special Tax Allocation may well have provided a factual predicate for a well-pled claim of breach that would survive a Rule 12(b)(6) challenge.  That is not the case *sub judice*.

[126] 6 *Del. C.* § 1101(d).

[127] The implied covenant does not extend beyond the parties to the contract.  Thus, to the extent it is applicable at all, only EEP GP may be held liable for a breach of the implied covenant. *See Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); *Encore Energy P'rs*, 2012 WL 3792997, at *12 n.84.

[128] *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *13 (Del. Ch. Oct. 28, 2010).

[129] *Allen v. El Paso Pipeline GP Co.*, 2014 WL 2819005, at *10 (Del. Ch. March 28, 2014).

[130] *Encore Energy P'rs*, 2012 WL 3792997, at *13.

Here, the LPA contemplates each breach alleged in the Complaint, including the scope of duties owed in connection with conflicted transactions and the extent to which EEP GP can cause EEP to allocate income among the Unitholders for tax purposes. Although the Supreme Court has held that a plaintiff's identification of a contractual gap is not an absolute prerequisite to sustain an implied covenant claim where one party "acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain,"[131] on these facts, where the LPA specifically addresses the challenged conduct and expressly eliminates fiduciary duties, the Court can discern no reasonable basis to allow the implied covenant claims to stand.[132]

### 6. Count VII—The Complaint Fails to State a Claim for Breach of Residual Fiduciary Duties

Brinckerhoff contends that because Section 6.10(d) extends its presumption of good faith only to EEP GP, the remaining Defendants are still subject to residual

---

[131] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 421 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[132] *See Encore Energy P'rs*, 2012 WL 3792997, at *13 (observing that "the 'right to enter into good and bad contracts' makes the implied covenant an ersatz substitute for the warning '*caveat emptor.*' Investors apprehensive about the risks inherent in waiving the fiduciary duties of those with whom they entrust their investments may be well advised to avoid master limited partnerships," and then holding that 'the elimination of fiduciary duties implies an agreement that losses should remain where they fall" (footnote omitted)); *Brinckerhoff I,* 2011 WL 4599654, at *11 (finding that the LPA addressed each of Brinckerhoff's claims regarding the special committee process, the conflicted nature of the 2009 Sale and, more generally, the standard by which the General Partner's conduct would be measured such that there was no basis to rewrite the agreement with implied covenants); *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1020 (Del. Ch. 2010) (holding that the express terms of the operative agreement "dispose[] of the plaintiff's contention that [the] implied covenant requires an 'adequate and fair sales process'").

fiduciary duties. Even if he is correct in his construction of Section 6.10, and there is good reason to conclude that he is not, Brinckerhoff's argument still fails to account for the various additional provisions of the LPA that allow all Defendants to avail themselves of the contractually established good faith standard.[133] Brinckerhoff's attempt to mine a residual fiduciary duty claim from a comprehensive LPA that expressly displaces them is unavailing. Count VII must be dismissed.[134]

### 7. Counts V and VI—The Complaint Fails to State Claims for Aiding and Abetting a Breach of the LPA or Tortious Interference with the LPA

Counts V and VI fail for two basic reasons. First, as a matter of law, Delaware does not recognize a claim for aiding and abetting a breach of contract.[135] Second, Brinckerhoff cannot state a claim for aiding and abetting a breach or tortious interference with contract when he has failed to state a claim for an underlying breach of the LPA.[136] Counts V and VI must be dismissed.

---

[133] *See supra* notes 103–06, 123, 126 and accompanying text.

[134] *Norton*, 67 A.3d at 368–69 (dismissing residual fiduciary duty claim).

[135] *Allen*, 2014 WL 2819005, at *20 (holding that where a limited partnership agreement "establishes a purely contractual relationship, a theory of aiding and abetting a breach of contract is unavailable"); *accord Gerber*, 2013 WL 209658, at *11 ("Delaware law does not recognize a claim for aiding and abetting a breach of contract," and therefore "claims—if they are asserted—for aiding and abetting a breach of the LPA, or a covenant implied through the LPA, must also fail").

[136] *Gerber v. Enter. Prods. Hldgs., LLC*, 2012 WL 34442, at *13 (Del. Ch. Jan. 6, 2012) ("A claim for tortious interference with a contract, as well as a claim for aiding and abetting a breach of duties, requires an underlying breach."), *aff'd in part, rev'd in part*,

### 8. Count VIII—The Complaint Fails to State Claims for Rescission or Reformation

With respect to his request for equitable remedies, Brinckerhoff argues (correctly) that while Section 6.8(a) shields Defendants from monetary damages for acts taken in good faith, it "does not preclude an award of equitable relief against any person, including EEP GP, Enbridge Management, or Enbridge."[137] The fact that the LPA's exculpatory provisions do not bar the claims, however, does not excuse Brinckerhoff from supporting his claims for reformation or rescission with well-pled facts that meet the requisite elements of these remedies. Here again, the Complaint falls short.

Brinckerhoff requests that the Court equitably reform the Transaction "to reflect a fair price for the AC Interest . . . or eliminate the amendment to Section 5.2(i) in the LPA."[138] As noted in *Brinckerhoff II*, however, reformation is a remedy meant to address very limited and exceptional circumstances:

> The reformation remedy that Brinckerhoff seeks . . . is rarely sought and obtained. Generally, "[r]eformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual

---

67 A.3d 400 (Del. 2013). *See also Brinckerhoff I*, 2011 WL 4599654, at *11 (noting that "a claim for tortious interference with a contract[] requires an underlying breach," and concluding that because the LPA was not breached, Brinckerhoff's aiding and abetting and tortious interference claims fail as a matter of law).

[137] Pl.'s Answering Br. 32.

[138] Compl. ¶ 175; *accord* Pl.'s Answering Br. 32.

mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence."[139]

Thus, to state a claim for reformation, Brinckerhoff was required to plead either fraud, mutual mistake or unilateral mistake with knowing silence.[140] No such facts have been pled here. While Brinckerhoff places much weight on the Court's recognition in *Brinckerhoff II* of its "broad remedial powers" to reform an agreement,[141] the Court cannot and will not do so absent well-pled allegations that the contract the parties agreed to does not reflect the parties' actual agreement.[142] Brinckerhoff's request for reformation fails as a matter of law.

Plaintiff's rescission claim suffers a similar fate. This Court has jurisdiction to hear a rescission action when

> damages are not available; when the amount of damages [is] not ascertainable; or when damages are inadequate to do justice. When a

---

[139] *Brinckerhoff II*, 2012 WL 1931242, at *3 (alteration in original) (footnote omitted) (quoting *James River-Pennington Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *7 (Del. Ch. Mar. 6, 1995)).

[140] *Universal Compression, Inc. v. Tidewater, Inc.*, 2000 WL 1597895, at *7 (Del. Ch. Oct. 19, 2000) ("[T]o state a claim for reformation of a contract, a party must allege that the contract as written does not represent the parties' actual intent, because of either fraud, mutual mistake or a unilateral mistake coupled with the other party's knowing silence or concealment.").

[141] Pl.'s Ansewring Br. 35 (quoting *Brinckerhoff II*, 2012 WL 1931242, at *3).

[142] *Carey v. Brittingham*, 1992 WL 71509, at *2 (Del. Ch. Apr. 6, 1992) ("Reformation is appropriate only where there is clear and convincing evidence that, because of mutual mistake, a written instrument does not properly reflect the agreement of the parties."), *aff'd*, 615 A.2d 530 (Del. 1992).

50

plaintiff, however, has a full, adequate and complete remedy at law, equity will not ordinarily interfere to rescind a contract.[143]

Even if Brinckerhoff had met his burden to plead facts that "explain how the Court could restore the parties to the positions they were in before they entered into the [Transaction],"[144] which he has not, the Complaint fails to explain or otherwise reveal why money damages would be "inadequate to do justice."[145] The Complaint merely states, in conclusory fashion, that "EEP's and the Public Unitholders' damages *may be* insufficient to make EEP and the Public Unitholders whole."[146] This unsupported allegation is hardly adequate to justify a wholesale undoing of the Transaction. Count VIII must be dismissed.

## III. CONCLUSION

The LPA contains broad protections for EEP GP, its Affiliates and other Indemnitees. These protections, and the enforcement of them as has occured here, harmonize well with the DRULPA's policy "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."[147] Pursuant to the LPA, Brinckerhoff was obliged to state well-pled facts that would allow a reasonable inference that Defendants acted in bad faith.

---

[143] *Russell v. Universal Homes, Inc.*, 1991 WL 94357, at *2 (Del. Ch. May 23, 1991).

[144] *Brinckerhoff II*, 2012 WL 1931242, at *4.

[145] *Russell*, 1991 WL 94357, at *2.

[146] Compl. ¶ 173 (emphasis added).

[147] 6 *Del. C.* § 17-1101(c).

Because he has failed to do so, and has failed to support his other claims with allegations that demonstrate a reasonably conceivable basis for recovery, Defendants' Motion to Dismiss is GRANTED.  An appropriate order accompanies this Memorandum Opinion.